[Nos. 58672-1, 58777-9, 59175-0.   En Banc.   May 20, 1993.]

*In the Matter of the Personal Restraint of* DEBBIE RUNYAN, *Petitioner.*

*In the Matter of the Personal Restraint of* BRIAN KELLY, *Petitioner.*

*In the Matter of the Personal Restraint of* STEPHEN ELLIOT GRAHAM, *Petitioner.*

*Carney, Badley, Smith & Spellman,* by *James E. Lobsenz* and *Barbara J. Van Ess,* for petitioner Runyan.

*Michael Nance* and *Nance, Iaria & Gombiner,* for petitioner Kelly.

*Scales & Associates, P.S.,* by *Sean A. Ayres,* for petitioner Graham.

*Christine O. Gregoire, Attorney General,* and *John M. Jones, Assistant; C. Danny Clem, Prosecuting Attorney for Kitsap County,* and *Pamela B. Loginsky, Deputy; Seth R. Dawson, Prosecuting Attorney for Snohomish County,* and *Seth Aaron Fine, Deputy; Jeffrey Sullivan, Prosecuting Attorney for Yakima County,* and *Bruce Hanify, Deputy,* for respondent.

*John Midgley* on behalf of Evergreen Legal Services and Institutional Legal Services Project; *Allen R. Bentley* on behalf of American Civil Liberties Union of Washington; *Scott J. Engelhard* on behalf of Washington Association of Criminal Defense Lawyers; *Robert C. Boruchowitz* on behalf of Washington Defender Association, amici curiae for petitioners.

DURHAM, J. — These three factually unrelated personal restraint petitions (PRPs) challenge the constitutionality of RCW 10.73.090 *et seq.* (the statute) which, with certain exceptions, require postconviction petitions for collateral relief to be filed within 1 year after the conviction becomes final. The petitioners argue that this time limit acts to suspend the writ of habeas corpus in violation of article 1, section 13 of our constitution. They also argue that the statute violates the equal protection clauses of both the federal and state constitutions. Alternatively, petitioners urge that, regardless of the statute's constitutionality, the time limit does not apply to their petitions because they did not receive proper notice of its terms as required by the statute. We reject petitioners' constitutional arguments and further hold that the notice provided by the Department of Corrections (Department) was sufficient under the statute.

An explanation of the procedural history of each of these PRPs is necessary in order to understand the effects of the statute and the various contentions of each of the petitioners. Petitioner Debbie Runyan was convicted of three counts of first degree statutory rape and two counts of indecent liberties in Kitsap County. She appealed, and the Court of Appeals affirmed her conviction. *State v. Runyan*, cause 9719-2-II (July 8, 1988). Her petition for review was denied by this court on November 29, 1988, and the mandate from this court was issued on December 29, 1988. Runyan is incarcerated at the Washington Corrections Center for Women.

On March 21, 1991, Runyan filed a PRP in the Court of Appeals, alleging both ineffective assistance of counsel due to conflict of interest and prosecutorial misconduct. The Court of

Appeals initially returned the PRP because it believed that the PRP was time barred by operation of RCW 10.73.090 and RCW 10.73.100. Runyan resubmitted the PRP on April 11, 1991, along with a letter explaining why the PRP was not time barred. On June 27, the Court of Appeals accepted the PRP for filing. However, in an order dated October 15, 1991, the Court of Appeals once again dismissed the PRP as untimely.

Runyan filed a motion in this court for discretionary review of this dismissal.[1] Additionally, Runyan has raised a claim that she never received notice of the statute, as required by RCW 10.73.120. The State has submitted affidavits showing that such notice was given on or after October 31, 1989, by posting administrative bulletins explaining the statute on inmate bulletin boards at the Washington Corrections Center for Women. Although Runyan acknowledges the existence of a bulletin board in her CCU unit, she does not recall ever seeing any legal notice posted on such bulletin board.

Brian Kelly pleaded guilty to first degree robbery in Snohomish County Superior Court on February 1, 1991. In computing his offender score, the sentencing judge used Kelly's five previous convictions.[2] Kelly filed a PRP on July 19, 1991, challenging the use of the three earliest convictions, stating that he had not been advised of his right to remain silent and that his guilty pleas in those cases were constitutionally invalid. The Court of Appeals dismissed the PRP, holding that Kelly had failed to show why he had not filed his PRP challenging those prior convictions within the time period mandated by the statute.

---

[1] The State and the Department supported her request insofar as it relates to the constitutionality of RCW 10.73.090.

[2] These prior convictions consisted of the following:

| Felony | Conviction Date | County & # |
| --- | --- | --- |
| Attempted Burglary 2* | 3/27/74 | King #67001 |
| Burglary 2* | 1/12/77 | King #78638 |
| Attempted Burglary 2* | 11/29/78 | King #86606 |
| Burglary 2 (2 counts) | 2/11/81 | King #80-1-02198-9 |
| Robbery 2 (3 counts) | 7/20/84 | King #84-1-00685-1 |

His PRP relates only to the validity of those convictions marked with an asterisk (*).

Kelly attests that he was on parole from March 11, 1988, until December 11, 1990, and that he regularly reported to his parole officer. The State contends that on December 5, 1989, a copy of the Attorney General's memorandum regarding the law, a Spanish language translation thereof, and a copy of the statute were sent to each community corrections office and work release center supervisor, with directions that the notice and translation be posted in their office or at the facility so it would be readily accessible to all offenders. The State attests to the fact that this notice remained posted in most offices and facilities until they moved or remodeled, and that as of May 1, 1992, four community corrections offices and one work release center still had these notices posted.

Stephen Graham[3] pleaded guilty to first and second degree statutory rape in Yakima County Superior Court on July 11, 1988. He signed a statement of defendant on plea of guilty which informed him that the maximum sentence for first degree statutory rape was "not less than 20 years", but which also informed him that the standard sentence for his crime was "at least 41 months and not more than 54 months" and that the prosecuting attorney would recommend that he receive 54 months to run concurrently with his second degree statutory rape term. Brief of Petitioner, Court of Appeals, exhibit 1. Because Graham's crimes occurred before the Sentencing Reform Act of 1981 (SRA), RCW 9.94A.010 *et seq.*, took effect, the judge sentenced Graham to a minimum term of 54 months with a maximum term of life on his first degree statutory rape charge. Graham's attorney told him that the judge was "not sentencing [Graham] to a specific time but is making a recommendation to the prison authorities, the prison parole board, as to what [his] time [would] be, and it may not be 54 months." Report of Proceedings (RP) (Sept. 13, 1988), at 8. The sentencing judge also told Graham that he did not know how long Graham was going to be in prison and

---

[3]Whereas the other petitioners appear here via a motion for discretionary review, Graham's petition was certified to this court by the Court of Appeals.

that there was "a range of months that's been discussed, and that's going to be determined later as you're going through." RP (Sept. 13, 1988), at 9. Graham contends that he did not realize that he could serve more than 54 months until he got to prison. He has been serving his term at the Twin Rivers Corrections Center.

Graham filed a PRP in the Court of Appeals on September 30, 1991. He maintains that his guilty plea was not knowing and voluntary because he was not properly informed about the possible consequences of such a plea. Alternatively, he asks that his plea bargain be specifically enforced. He also claims that he was not notified by prison officials as to the existence and effect of RCW 10.73.090 as required by the statute, and that he did not learn of the statute until August 1991 when informed of it by his attorney. In its initial briefing to the Court of Appeals, the State conceded that it "[did] not believe it [could] demonstrate that notice was given to Mr. Graham . . .." Response to Personal Restraint Petition, at 4. However, in its briefing to this court, the State has produced the affidavit of Janet Barbour, Superintendent of the Twin Rivers Corrections Center, in which she states that she had copies of the Attorney General's notice regarding this law distributed to each inmate, as well as posted on bulletin boards, sometime after November 6, 1989.

### CONSTITUTIONALITY

■ The underlying contention of all three petitioners is that *any* time limit on petitions for a writ of habeas corpus acts as an unconstitutional suspension of the writ. Our constitution secures for citizens of this state the right to petition for the writ. "The privilege of the writ of habeas corpus shall not be suspended, unless in case of rebellion or invasion the public safety requires it." Const. art. 1, § 13. The writ referred to in this clause (hereinafter the suspension clause) is generally acknowledged to be the writ of habeas corpus ad subjiciendum, which is a writ issued pursuant to a petition, directing an official who is detaining another to show the cause of that person's confinement, and why he or she

should not be released. *Toliver v. Olsen*, 109 Wn.2d 607, 609, 746 P.2d 809 (1987). This court must now decide whether the limitations imposed by RCW 10.73.090 suspend this privilege.

In 1976, this court adopted Rules of Appellate Procedure 16.3-16.15, which provide a unitary postconviction remedy and replaced the former miscellaneous postconviction procedures, including most petitions for a writ of habeas corpus. *See Toliver*, at 610-11. In 1989, the Legislature enacted a new law which attempts further to streamline collateral review of judgments and sentences. This statute reads, in relevant part:

> No petition or motion for collateral attack on a judgment and sentence in a criminal case may be filed more than one year after the judgment becomes final if the judgment and sentence is valid on its face and was rendered by a court of competent jurisdiction.

RCW 10.73.090(1).[4]

The 1-year time limit for filing is not a blanket limitation. Broad exceptions are given for newly discovered evidence, convictions under unconstitutional statutes, convictions barred by double jeopardy, convictions obtained with insufficient evidence, sentences in excess of the court's jurisdiction, or significant changes in the law which will apply retroactively to the petitioner's case. RCW 10.73.100. The law applies only to petitions filed more than 1 year after July 23, 1989, which is the date the statute went into effect. RCW 10.73.130. This gave a 1-year window in which all outstanding petitions could be brought regardless of the passage of time.

██ Petitioners argue that the scope of the privilege secured by our state constitution has expanded over time to encompass the United States Supreme Court's incorporation of fed-

---

[4]"Collateral attack" is specifically defined to include personal restraint petitions and habeas corpus petitions. RCW 10.73.090(2). A judgment is considered "final" as of the last of the following dates: the date it is filed with the clerk of the trial court; the date of the mandate from an appellate court disposing of a timely direct appeal; or the date the United States Supreme Court denies certiorari to review a decision affirming the conviction on direct appeal. RCW 10.73.090(3).

eral due process guaranties onto the states. To that end, they cite numerous examples of the changing parameters given to the federal guaranty of the writ of habeas corpus. *Compare Frank v. Mangum*, 237 U.S. 309, 59 L. Ed. 969, 35 S. Ct. 582 (1915) (assertion that due process violated by "mob spirit" dominating state proceedings not grounds for habeas relief) *with Moore v. Dempsey*, 261 U.S. 86, 67 L. Ed. 543, 43 S. Ct. 265 (1923) (contention that "mob spirit" dominated state proceedings cognizable through habeas corpus). As a preliminary matter, it must be recognized that the federal suspension clause does not serve the same purpose as our own state suspension clause. *See* William F. Duker, *A Constitutional History of Habeas Corpus* 131 (1980) ("[The federal] clause was meant only as a restriction on the federal legislature *vis a vis* state habeas."). The traditional function of federal habeas courts has been to "ensure that individuals are not imprisoned in violation of the Constitution . . .." *Herrera v. Collins*, ___ U.S. ___, 122 L. Ed. 2d 203, 216-17, 113 S. Ct. 853 (1993). Because of the differing functions of state and federal habeas, we do not find federal law regarding the federal suspension clause to be determinative as to the boundaries of our own suspension clause.

■ Rather than examining the allegedly mutable parameters of the federal suspension clause, this court has looked to the scope of the common law privilege at the time of our state suspension clause's enactment as defining the privilege protected by our state constitution. *See, e.g., In re Grieve*, 22 Wn.2d 902, 906, 158 P.2d 73 (1945). Essentially, the State's suspension clause protects the right of citizens to challenge the jurisdiction of the sentencing court.[5] Traditionally, the writ of habeas corpus could not be used to attack even an erroneous judgment, unless that judgment was void for lack of jurisdiction. *Voigt v. Mahoney*, 10 Wn.2d 157, 162-63, 116 P.2d 300 (1941). *See also Herrera* (claims of actual innocence not cognizable in federal habeas proceedings).

---

[5]"Jurisdiction" refers to personal and subject-matter jurisdiction, including sentences based on non-existent laws. *In re Grieve*, 22 Wn.2d 902, 906-08, 158 P.2d 73 (1945).

In one of this court's earliest opinions, Justice Hoyt[6] explained that at the common law, a petition for a writ of habeas corpus was defeated merely by showing that:

> the petitioner was held by any process or judgment good upon its face [which] not only precluded inquiry into the validity of such process or judgment, but also precluded inquiry as to the facts of his being held by such process or judgment at all.

*In re Lybarger*, 2 Wash. 131, 134, 25 P. 1075 (1891). *Lybarger* involved the interpretation of a specific state statute, which had been on the books since 1854, and which prohibited a court from inquiring into the legality of the judgment or process of any court of competent jurisdiction. *Lybarger*, at 132; *see also* RCW 7.36.130. We have adjudged this to be the scope of our state privilege ever since. *See In re Grieve*, 22 Wn.2d 902, 904, 158 P.2d 73 (1945); *Palmer v. Cranor*, 45 Wn.2d 278, 280, 273 P.2d 985 (1954). *See also Holt v. Morris*, 84 Wn.2d 841, 852, 529 P.2d 1081 (1974) (Hale, C.J., concurring); *In re Haynes*, 95 Wn.2d 648, 653, 628 P.2d 809 (1981), *overruled in part on other grounds in In re Hews*, 99 Wn.2d 80, 660 P.2d 263 (1983).

In 1945, this court had occasion to reexamine the writ of habeas corpus, and once again held that the inquiry under the common law and secured by the state suspension clause was quite narrow.[7] *In re Grieve*, 22 Wn.2d 902, 158 P.2d 73 (1945). We reaffirmed that the state statute forbidding any

---

[6] Justice Hoyt was formerly the president of the Washington State Constitutional Convention which drafted our suspension clause. *Journal of the Washington State Constitutional Convention, 1889,* at 465 (B. Rosenow ed. 1962).

[7] The occasion for this examination of the writ was to explain to those advocates who were aiding state prisoners that "in the courts of this state, the writ of *habeas corpus* cannot be used as a medium to review trial errors, but that its authorized use is limited by law to those cases where it appears that the judgment and sentence, by virtue of which the petitioner is held in confinement, is void *on its face*." *Grieve*, at 904. The Justices felt that a reexplanation of the habeas doctrine was necessary because "[o]n nearly every motion calendar of this court, for a number of years, there has appeared one or two applications for writs of *habeas corpus* by persons confined in the state penitentiary." *Grieve*, at 903. Our current generous procedures for petitioning for collateral relief would most likely amaze and confound our esteemed predecessors.

court to look behind the final judgment of a court of competent jurisdiction exactly concorded with the scope of the writ guaranteed by our constitution, and that unless the scope of the inquiry was expanded by the Legislature, the court would look no further. *Grieve*, at 904. The final paragraph of this decision illustrates the narrowness of this inquiry:

> In this opinion, we have . . . endeavored to make it clear that allegations that the petitioner was convicted by a confession secured by third-degree methods, or pleaded guilty upon the promise that he would receive a light sentence, or under a threat of the prosecuting attorney that he would be shot unless he did so, or was convicted because the trial judge refused to suppress evidence secured without a search warrant . . . furnish no basis for the issue of a writ of *habeas corpus* . . .. If such allegations are true, and can be sustained, some other remedy must be invoked.

*Grieve*, at 911-12.

Petitioners are correct in observing that the scope of collateral relief has changed over time in Washington. However, these statutory changes have never affected, nor could they affect, the core constitutional inquiry protected by our state suspension clause. In 1947, the Legislature amended the statute governing the scope of judicial inquiry in habeas cases to allow inquiry into the facts and process behind the judgment in cases where the petitioner alleged a constitutional violation. *See* RCW 7.36.130(1); *see also Palmer v. Cranor*, 45 Wn.2d 278, 273 P.2d 985 (1954). While this legislative enactment expanded the scope of postconviction collateral relief, and did so through the procedural device of the writ of habeas corpus, it did not expand the constitutionally protected inquiry. The Legislature has long played a role in deciding the scope of collateral relief, and this court has accepted this involvement, so long as the scope of the relief afforded is not constricted beyond the narrow boundaries of our constitution.

Nonetheless, in order to determine whether the time limit at issue here violates our constitution, we must examine the limits placed on petitions for habeas corpus at the enactment of our suspension clause. It seems clear that there was never any time limit for habeas petitions at common law.

*See* Donald E. Wilkes, Jr., *Federal and State Postconviction Remedies and Relief* 5 (2d ed. 1987). There is also support in federal case law for the proposition that there is no statute of limitations on the federal right to habeas relief.[8] *See United States v. Smith*, 331 U.S. 469, 475, 91 L. Ed. 1610, 67 S. Ct. 1330 (1947); *Heflin v. United States*, 358 U.S. 415, 420, 3 L. Ed. 2d 407, 79 S. Ct. 451 (1959) (Stewart, J., concurring); *Palmer v. Ashe*, 342 U.S. 134, 96 L. Ed. 154, 72 S. Ct. 191 (1951). Similarly, petitioners contend that this court has made veiled reference in dicta to the inapplicability of a statute of limitations to habeas corpus actions. *Haynes*, at 653-54. A strict statute of limitations on all habeas petitions would be a derogation of the common law writ of habeas corpus and hence, an unconstitutional suspension of the writ.

■ However, we are not faced with such a strict time limit on habeas petitions. Six substantial exceptions are listed in the statute. RCW 10.73.100. One of these exceptions is specifically for sentences imposed "in excess of the court's jurisdiction". RCW 10.73.100(5). This exception alone is adequate to preserve the jurisdictional inquiry protected by our constitution. As well, the statute itself only applies to attacks on judgments rendered by "a court of competent jurisdiction", thereby specifically excluding from its ambit any petition which calls for the constitutional habeas inquiry into jurisdiction. RCW 10.73.090. We find that the constitutional scope of habeas relief has been explicitly preserved by this statute and that, hence, the statute is constitutional.

In addition to preserving the constitutional core of habeas corpus, this statute also allows exceptions when later developments bring into question the validity of the petitioner's continuing detention. Exceptions are made for circumstances

---

[8]More recently, the United States Supreme Court suggested that Congress might have the power to create a statute of limitations for federal habeas corpus actions. *Vasquez v. Hillery*, 474 U.S. 254, 265, 88 L. Ed. 2d 598, 106 S. Ct. 617 (1986). However, the Court refused to judicially create such a rule to achieve the same end. *Vasquez*, 474 U.S. at 265.

which impact directly on the guilt or innocence of the petitioner, such as the discovery of new evidence, RCW 10.73-.100(1), or convictions obtained with insufficient evidence, RCW 10.73.100(4). An exception is made for convictions barred by double jeopardy, which are also prohibited by article 1, section 9 of our constitution. RCW 10.73.100(3). Similarly, an exception is made for convictions under unconstitutional statutes, RCW 10.73.100(2), which are as no conviction at all and invalidate the prisoner's sentence. *See, e.g., Seattle v. Rice*, 93 Wn.2d 728, 612 P.2d 792 (1980). The statute also leaves open avenues for pursuing collateral relief when subsequent changes in the law could apply retroactively to the petitioner's case, RCW 10.73.100(6), which is a circumstance which could not always be readily ascertained within 1 year of final conviction. These exceptions are broader than is necessary to preserve the narrow constitutional scope of habeas relief. The Legislature, of course, is free to expand the scope of collateral relief beyond that which is constitutionally required, and here it has done so to include situations which affect the continued validity and fairness of the petitioner's incarceration.

Our conclusion that this statute of limitations on petitions for collateral review is constitutional is supported by the decisions of a number of other jurisdictions as well. At least 14 other states have also responded to the copious flow of postconviction collateral relief petitions by enacting a time limit for such petitions.[9] In only one instance has a time limit been held to be unconstitutional. *See People v. Germany*, 674 P.2d 345 (Colo. 1983) (statute inadequate because it failed to distinguish between challenges that could have

---

[9] *See, e.g.*, Colo. Rev. Stat. § 16-5-402 (Supp. 1992); Fla. R. Crim. P. 3.850; Ga. Code Ann. § 40-13-33 (Michie 1991); Idaho Code § 19-4902 (Supp. 1992); Ill. Ann. Stat. ch. 38, para. 122-1 (Smith-Hurd Supp. 1992); Iowa Code Ann. § 822.3 (West Supp. 1993); Miss. Code Ann. § 99-39-5(2) (Supp. 1992); Mo. R. Crim. P. 24.035, 29.15; Nev. Rev. Stat. § 34.800 (1991); N.J. Crim. Prac. Rule 3:22-12; Or. Rev. Stat. § 138.510 (1991); S.D. Codified Laws § 21-27-3.2 (Supp. 1992); Utah Code Ann. § 78-12-31.1 (1992); Wyo. Stat. Ann. § 7-14-103(d) (Supp. 1992).

been raised in a timely manner and those which were incapable of being raised in the specified period).[10] Although federal habeas practice does not contain an enumerated time limit for habeas petitions, the federal habeas corpus rules also allow for dismissal due to unreasonable delay. 28 U.S.C. § 2254 rule 9(a) (1988). *See also McDonnell v. Estelle*, 666 F.2d 246, 249-50 (5th Cir. 1982) (purpose of rule 9(a) was to codify equitable doctrine of laches which has always been applied to habeas petitions).

▮ Our conclusion of constitutionality is bolstered by a recent decision by the Oregon Supreme Court. *Bartz v. State*, 314 Or. 353, 839 P.2d 217 (1992). The suspension clause of our state constitution is identical to article 1, section 23 of the Oregon Constitution and was modeled after it. *Journal of the Washington State Constitutional Convention, 1889*, at 501 n.21 (B. Rosenow ed. 1962). Because of the influence the Oregon Constitution had on our own constitution, we often look to Oregon decisional law when interpreting clauses which are similar. *See, e.g., State v. Rupe*, 101 Wn.2d 664, 707, 683 P.2d 571 (1984).

Oregon has enacted a 120-day time limit for postconviction collateral attacks,[11] with an exception if the court "finds

---

[10]The Colorado court depended on examples such as convictions under unconstitutional statutes and convictions obtained in violation of double jeopardy to bolster its decision that the statute violated due process of law. *People v. Germany*, 674 P.2d 345, 352-53 (Colo. 1983). However, our statute provides broad exceptions for these situations, as well as others not mentioned by the Colorado court.

[11]As in Washington, Oregon has established a unitary procedure for seeking postconviction collateral relief, known as the Post-Conviction Hearing Act (PCHA). Or. Rev. Stat. §§ 138.510-.680 (1991). Oregon's PCHA also explicitly preserves the writ of habeas corpus as a separate avenue of relief. Or. Rev. Stat. § 138.540(1) (1991). The 120-day time limit only applies to petitions under the PCHA, while our own 1-year time limit applies to all postconviction collateral relief, including petitions for a writ of habeas corpus. *Compare* RCW 10.73.090(2) *with* Or. Rev. Stat. § 138.510(2) (1991). However, the PCHA is the exclusive means for persons to challenge convictions on the substantive grounds set out in the statute, even if those challenges were formerly available through the writ of habeas corpus. Or. Rev. Stat. § 34.330(3) (1991). Hence, any time limit on petitions for PCHA relief also constitutes a time limit on habeas relief inasmuch as the substantive grounds are the same. *Bartz v. State*, 314 Or. 353, 362, 839 P.2d 217 (1992).

grounds for relief asserted which could not reasonably have been raised in the original or amended petition". Or. Rev. Stat. § 138.510(2) (1991). The Oregon Supreme Court held that this time limit did not violate its state suspension clause. *Bartz*, 314 Or. at 366.

> Any legal system, including habeas corpus, requires procedures to implement it. So long as those procedures are not tantamount to a suspension of the system of habeas corpus — that is, so long as those procedures are reasonable for persons who seek redress — they do not offend the state constitutional ban on suspending habeas corpus.

*Bartz*, 314 Or. at 365. Finding that the 120-day limit was reasonable, it upheld the statute. *Bartz*, 314 Or. at 365-66.

The most important functional difference between our statute and that of Oregon is the breadth of the exceptions to the time limit. Our statute lists six broad exceptions; the Oregon statute only allows an exception when the court finds grounds for relief that could not have been raised earlier. *Compare* RCW 10.73.100 *with* Or. Rev. Stat. § 138-.510(2) (1991). The Oregon Supreme Court has already decided that Oregon's lone exception is to be construed narrowly. *Bartz*, 314 Or. at 359. In discussing what types of situations would fit into their limited exception, the Oregon court listed such things as the discovery of new evidence and convictions under unconstitutional statutes. *Bartz*, 314 Or. at 358-59. Of course, these situations are already covered by our own statute, along with other specific exceptions which are broader than those contemplated in the Oregon statute.[12] Oregon's finding of constitutionality for its even more restrictive statute comports with the conclusion we reach today.[13]

---

[12]For instance, our statute allows an exception for convictions which are barred by double jeopardy. Seemingly, this would be information which would be available to the defendant almost immediately after conviction, and hence would not be able to be raised collaterally in Oregon beyond 120 days after the date of judgment or final appeal.

[13]One additional state constitutional argument is raised by petitioner Graham in his brief. He argues that the 1-year limitation also acts as an unconstitutional

■ In addition to the suspension clause arguments, petitioners Graham and Runyan additionally raise two distinct equal protection claims under the Fourteenth Amendment and Const. art. 1, § 12. The equal protection clauses of both the state and federal constitutions require that "persons similarly situated with respect to the legitimate purpose of the law receive like treatment." *Harmon v. McNutt*, 91 Wn.2d 126, 130, 587 P.2d 537 (1978). Graham claims that the statute at issue violates the equal protection rights of indigent prisoners because they are unable to acquire legal representation quickly enough to collaterally attack their convictions.[14] Runyan claims that the statute at issue violates the equal protection clause because it arbitrarily includes certain exceptions but not others.

■ To resolve an equal protection challenge, we must first determine the appropriate standard of review. Both petitioners claim that their contentions merit an intermediate level of scrutiny. Because the classifications here are not gender based, intermediate scrutiny will be applied only if the statute implicates both an important right and a semi-suspect class not accountable for its status. *State v. Schaaf*, 109 Wn.2d 1, 17-18, 743 P.2d 240 (1987).

■ Physical liberty, while not a fundamental right, is an important right. *State v. Phelan*, 100 Wn.2d 508, 514, 671 P.2d 1212 (1983). Although we have also recognized that classifications based solely on wealth may form a semi-suspect class, *Phelan*, at 514, this statute does not classify inmates according to their financial resources. Moreover, there is no absolute constitutional right to legal representa-

---

divestiture of this court's original jurisdiction in habeas corpus, as granted in the Washington Constitution, article 4, section 4. However, as we have found that the statute protects the constitutional scope of habeas relief without limit of time, there also has not been any unconstitutional loss of jurisdiction.

[14]Graham also argues that the Washington State Constitution provides even greater protection to indigent inmates than does the federal constitution. However, this court has already held that the equal protection clauses of the federal and state constitutions are substantially identical in their impact upon state legislation. *Housing Auth. v. Saylors*, 87 Wn.2d 732, 557 P.2d 321 (1976).

tion in PRPs, *Campbell v. Blodgett*, 978 F.2d 1502, 1516 (9th Cir. 1992), and indigent inmates in this state will be furnished, under certain conditions, appointed counsel to file a petition for habeas relief. *Honore v. State Bd. of Prison Terms & Paroles*, 77 Wn.2d 660, 466 P.2d 485 (1970). Finally, the inclusion of some exceptions, but not others, does not operate to create any semi-suspect class. *See Masunaga v. Gapasin*, 57 Wn. App. 624, 634, 790 P.2d 171, *review denied*, 115 Wn.2d 1012 (1990). The proper test for these claims is the rational relationship test, whereby the statute will be upheld unless it is wholly irrelevant to achieving a legitimate state objective. *Phelan*, at 512.

▬▬▬ Applying the rational relationship test to both of these challenges, we hold that the statute is a reasonable means for controlling the flow of postconviction collateral relief petitions and does not violate the equal protection clause of either the state or federal constitution. As to Graham's claim, this court has previously stated that "[t]he equal protection clause does not require a state to eliminate all inequalities between the rich and the poor." *Riggins v. Rhay*, 75 Wn.2d 271, 283, 450 P.2d 806 (1969). RCW 10.73-.090 makes no distinction among rich or poor prisoners and applies equally to both. As to Runyan's claim, "the mere fact that a statutory classification does not provide a remedy for every conceivable type of injury does not render the statute irrational or unconstitutional." *Masunaga*, at 634. Faced with a virtually unlimited universe of possible postconviction claims, the Legislature wisely chose to exempt those contentions which go to the very validity of the prisoner's continued incarceration.

Finally, petitioner Kelly raises one more challenge. He states that, because of our holding in *State v. Ammons*, 105 Wn.2d 175, 713 P.2d 719, *cert. denied*, 479 U.S. 930 (1986), he was unable to challenge his prior convictions at sentencing, as they were not constitutionally invalid on their face. Now, due to the retroactive effect of the 1-year statute of limitations and the expiration of the "grandfathering" period, he is unable to challenge his prior convictions after sentenc-

ing. He has been convicted five times before for similar crimes, but professes to have never been informed of his right to remain silent in the first three of these convictions, all of which are over 10 years old.[15] Nevertheless, the very purpose of RCW 10.73.090 is to curtail exactly this type of delay in challenging convictions.

We recognize that an alternative outcome has been formulated in habitual criminal proceedings, and that, at least facially, these two proceedings may seem similar. *See State v. Holsworth*, 93 Wn.2d 148, 607 P.2d 845 (1980). However, as we noted in *Ammons* itself, the determination of the offender score under the SRA is not the same as a determination of habitual offender status. *Ammons*, at 185-86. At sentencing under the SRA, the defendant has already been convicted, and the judge is simply "determining the terms and conditions of the sentence within a lawful maximum." *Ammons*, at 186. Procedures required for habitual offender proceedings are inapplicable to standardized sentencing under the SRA.

Kelly argues that the 1-year limit should not begin to run against him until his prior convictions are used in the sentencing for his present conviction. To allow such a reading would undermine the very purpose of RCW 10.73.090, which is to encourage prisoners to bring their collateral attacks promptly. We note that all defendants are currently

---

[15]In 1969, the United States Supreme Court stated that, in order for a guilty plea to be upheld on review, there must be some evidence to show that the defendant entered the plea voluntarily and with awareness of the rights relinquished by the plea, including the right to remain silent. *Boykin v. Alabama*, 395 U.S. 238, 242, 23 L. Ed. 2d 274, 89 S. Ct. 1709 (1969). We applied the principles of *Boykin* in 1976 when we stated that:

> there is no constitutional requirement that there be express articulation and waiver of the three rights referred to in *Boykin* by the defendant at the time of acceptance of his guilty plea if it appears . . . that the accused's plea was intelligently and voluntarily made, with knowledge of its consequences.

*Wood v. Morris*, 87 Wn.2d 501, 508, 554 P.2d 1032 (1976). Although Kelly does not contend that his previous guilty pleas were not voluntary, he would still have this court reexamine his prior pleas solely because the standardized forms upon which they were taken failed to explicitly include his right to remain silent.

informed at sentencing of the 1-year time limit. RCW 10.73-.110. The Legislature also granted petitioners, such as Kelly, a 1-year window of opportunity in which to challenge the validity of all such prior convictions, and now that window has closed. Unless the petitioner can challenge these convictions under one of the exceptions, his challenge is now barred.

## NOTICE

Having found that the statute of limitations is constitutional, we now turn to the question of whether the petitioners received proper notice as required by the statute. RCW 10.73.120 states in full:

> As soon as practicable after July 23, 1989, the department of corrections shall attempt to advise the following persons of the time limit specified in RCW 10.73.090 and 10.73.100: Every person who, on July 23, 1989, is serving a term of incarceration, probation, parole, or community supervision pursuant to conviction of a felony.

Each of the three petitioners, who were all incarcerated in different facilities, or on parole, contend that this section mandates that they must have received actual notice of the effect of the statute in order for it to be applied against them. Each contends that he or she did not receive such notice and was prejudiced by such lack of notice. The Department focuses on the words "attempt to advise" as demonstrating that actual notice was not contemplated by the statute. The Department believes that use of the word "attempt" assumes that some people will not receive notice. Alternatively, petitioners contend that the actions actually undertaken by the Department did not encompass a sufficient attempt to advise.

The Department does not contend that it attempted to provide actual notice in all cases, and it appears from the facts given that there was no uniform method used for providing notice. Each of the petitioners here was dealt with differently. Probationers and parolees, such as Kelly, were provided notice through the posting of such notice in community corrections offices in December of 1989. The Washington Corrections Center for Women, where Runyan is incarcer-

ated, provided notice by posting a bulletin on the inmate bulletin boards on October 31, 1989. The Twin Rivers Corrections Center, where Graham is incarcerated, distributed a copy of the Attorney General's notice to each inmate in the facility on November 6, 1989, and also posted the notice on bulletin boards in the facility.

▉ The Department's failure to provide actual notice of the statute to petitioners is not fatal, however, because the statute does not require actual notice. In each of these cases, the Department did attempt to notify the petitioners about the statute. As pointed out above, the statute only uses the language "attempt to advise". RCW 10.73.120. Had the Legislature intended the Department to provide actual notice, it certainly would have said so. We have already determined that the language of RCW 10.73.120 is not ambiguous. *In re Vega*, 118 Wn.2d 449, 450, 823 P.2d 1111 (1992). A good faith effort to advise is all that is required of the Department.

Our recent decision in *Vega* supports this conclusion. There, a prisoner who was serving a sentence in a federal prison, and had received a Washington conviction before July 23, 1989, protested that he had never received notice of the statute. The facts were clear that the Department neither notified nor attempted to notify him. *Vega*, at 450. This court held that, as there was no attempt to notify, the statute could not be applied against that prisoner. *Vega*, at 451. However, we cautioned that "[h]ad there been actual notification or *even attempted notification*, the petition would have been properly denied." (Italics ours.) *Vega*, at 451.

▉ Having found that the statute does not require the Department to provide actual notice to all prisoners and parolees, we must also decide whether the Department's actions in providing notice fulfilled its duty to attempt to advise the petitioners about the time limit. Whether and how petitioners actually learned of the statute is not dispositive on this issue, as the only duty placed on the Department was to attempt notification.[16] Defendants sentenced after

---

[16]Petitioners also ask that we resolve who should have the burden of proof to demonstrate that an attempt to advise was actually undertaken. Once the defend-

July 23, 1989, will have been advised by the sentencing court of the time limit for collateral attacks. RCW 10.73.110. Faced with a large number of prisoners and parolees under differing degrees of incarceration, limited funds, and a heterogenous and multi-lingual audience, the Department did its best to inform those under its jurisdiction of their rights under RCW 10.73.090. None of the petitioners here can say, as the petitioner in *Vega* could, that no attempt whatsoever was undertaken. The Legislature left it to the Department to decide how such notification was to be carried out, and we find that its actions were sufficient to fulfill its duty to make a good faith attempt. This court will not question its methods so long as a good faith attempt to notify was undertaken.

As was stated by Justice Holmes many years ago, the writ of habeas corpus is not to be granted for the correction of minor procedural defects or irregularities, but rather is reserved for cases "where the processes of justice are actually subverted." *Frank v. Mangum*, 237 U.S. 309, 346-47, 59 L. Ed. 969, 35 S. Ct. 582 (1915) (Holmes, J., dissenting). In streamlining the postconviction collateral review process, RCW 10.73.090 *et seq.* have preserved unlimited access to review in cases where there truly exists a question as to the validity of the prisoner's continuing detention. However, as this court warned almost 20 years ago, postconviction collateral review was never intended to be a "superconstitutional procedure enabling [the petitioner] to institute appeal upon appeal and review upon review in forum after forum ad infinitum." *Holt v. Morris*, 84

---

ant has been convicted, he or she generally has the burden of proof when challenging the validity of his or her conviction through a PRP. *Miesbauer v. Rhay*, 79 Wn.2d 505, 509, 487 P.2d 1046 (1971), *overruled in part on other grounds in Wood v. Morris*, 87 Wn.2d 501, 554 P.2d 1032 (1976). *See also Herrera v. Collins*, ___ U.S. ___, 122 L. Ed. 2d 203, 216, 113 S. Ct. 853 (1993) (Once a defendant has been duly convicted, the presumption of innocence disappears.). When a petitioner files a PRP containing his or her sworn affidavit that no attempt to advise was made, the State then has the burden of production to show such attempt. Affidavits of corrections officers as to this attempt, or the sentencing documents themselves if notice of the statute is contained therein, will be sufficient to meet the State's burden of production. If the petitioner cannot produce additional credible evidence to overcome the State's evidence, his or her petition will be properly denied.

Wn.2d 841, 852, 529 P.2d 1081 (1974) (Hale, C.J., concurring). This general 1-year time limit is a reasonable and constitutional method for ensuring that collateral review does not degenerate into such a procedural merry-go-round.

Accordingly, we affirm the dismissal by the Court of Appeals of Runyan's and Kelly's personal restraint petitions, and dismiss Graham's personal restraint petition.

ANDERSEN, C.J., and BRACHTENBACH, DOLLIVER, and GUY, JJ., concur.

JOHNSON, J. (concurring in part, dissenting in part) — I concur that the time limitations contained in RCW 10.73.090 and RCW 10.73.100 withstand constitutional scrutiny. The Department of Corrections (Department) failed, however, to provide adequate notice to the petitioners of these new time limitations, contrary to the notice requirement contained in RCW 10.73.120. I therefore dissent. The Department's notices in these cases contained no information about the crucial 1-year "window of opportunity" or "grandfathering" period even though this was basically the only time period during which the petitioners could have presented their challenges. Moreover, the Department's act of posting its notices on various bulletin boards did not discharge the Department of its statutory responsibility under RCW 10.73.120 to attempt to inform "*every* person" within the statutory class of the new time limitations. (Italics mine.) The petitioners did not receive proper notice of these time limitations. Under this court's decision in *In re Vega*, 118 Wn.2d 449, 823 P.2d 1111 (1992), the petitioners should not be barred from presenting their postconviction challenges.

RCW 10.73.120 requires the Department to:

> *attempt to advise* the following persons of the time limit specified in *RCW 10.73.090 and 10.73.100: Every person* who, on July 23, 1989, is serving a term of incarceration, probation, parole, or community supervision pursuant to conviction of a felony.

(Italics mine.) This statute specifically requires the Department to attempt to notify the designated class members of the time limits contained in RCW 10.73.090 and RCW 10.73-.100. The notices the Department issued in these cases failed to meet these explicit requirements.

RCW 10.73.090 involves two time limitations. The first is contained in the language of RCW 10.73.090(1):

> No petition or motion for collateral attack on a judgment and sentence in a criminal case may be filed more than one year after the judgment becomes final if the judgment and sentence is valid on its face and was rendered by a court of competent jurisdiction.

The notices the Department issued in these three cases only provided information on this first time limitation.[17]

RCW 10.73.090, however, also contains a second, more important time limitation. This limitation is contained in the statute's operative date. The Legislature promulgated RCW 10.73.090 on July 23, 1989, but the statute did not become operative until July 24, 1990. *See* RCW 10.73.130; Laws of 1989, ch. 395. This 1-year time period, from July 1989 to July 1990, is the 1-year "grandfathering" or "window of opportunity" period referenced in the majority opinion. See majority, at 449-51. The Legislature provided this 1-year period for individuals whose sentences had already become final prior to July 23, 1989. During this 1-year period, these individuals had the right to petition for postconviction relief without being barred from doing so by RCW 10.73.090.

The Department's failure to mention the 1-year "window of opportunity" period rendered the Department's notices in these cases statutorily defective. By only mentioning the

---

[17]The Department provided to the court copies of the notices it used in each of these cases. See Affidavit of Dave Savage, Director, Division of Community Corrections, Attachment B (petitioner Kelly); Affidavit of Janet Barbour, Superintendent, Twin Rivers Corrections Center, Attachment A (petitioner Graham); Affidavit of Eldon Vail, Superintendent, Washington Corrections Center for Women, Attachment A (petitioner Runyan).

first time limit and not the "window of opportunity" period, the Department's notices conveyed the misleading impression that RCW 10.73.090(1) barred anyone whose sentence became final 1 year prior to July 23, 1989, from filing *any* petition for postconviction relief. This misleading impression was reinforced by the Department's failure to also mention RCW 10.73.100 in its notices, the other statute the Department was explicitly required to mention pursuant to RCW 10.73.120. RCW 10.73.100 specifies the six circumstances when a petition will not be deemed untimely no matter when it was filed. If the notices in these cases had contained information about these six circumstances and the "window of opportunity" period, the notices would have been sufficient under RCW 10.73.120.

The Legislature required the Department to attempt to notify a specific class of individuals of the new time limits. Each member of this class has one thing in common: each was convicted of a felony prior to July 23, 1989. *See* RCW 10.73-.120. The sentences of many of these individuals, including each of the three petitioners, became final prior to July 23, 1989.[18] The 1-year "window of opportunity" was basically these petitioners' *only opportunity* to seek collateral relief before their challenges could become untimely under RCW 10.73.090. This 1-year "window of opportunity" period was crucial for these petitioners, but the Department failed to mention this time period in its notices. These notices were statutorily defective, and did not discharge the Department of its statutory responsibility to attempt to provide notice to the petitioners.

This court determined in *In re Vega, supra,* that the Department must comply with the notice requirement before an individual's postconviction petition may be barred by the 1-year time limit contained in RCW 10.73.090. *Vega,* 118 Wn.2d at 451. In *Vega,* the petitioner was serving a federal

---

[18]Petitioner Kelly's sentence became final in 1991. However, his prior convictions, which were used to calculate his offender score, all became final prior to 1989. Kelly's personal restraint petition challenges the validity of these prior convictions.

prison sentence at the time the Legislature enacted the 1-year time limitation contained in RCW 10.73.090(1). The Department made no effort to attempt to notify Vega of these changes. The court held that Vega was not barred from raising his postconviction challenge because the Department did not comply with the statutory notice requirement. *Vega,* 118 Wn.2d at 451. Similarly, in these cases, the Department failed to comply with the notice requirement because its notices did not contain adequate information about the time periods contained in RCW 10.73.090 and RCW 10.73.100. Pursuant to *Vega,* the petitioners in this case should not be barred from filing their challenges for postconviction relief.

The Department's method of merely posting the notice on various bulletin boards in general areas of a prison or a community corrections office, as in the case of petitioners Runyan and Kelly, also failed to meet the statutory requirement of notifying individuals of the relevant time limits. The record in these cases does not indicate how long the notices were posted on the bulletin boards, how accessible the posting locations were, or whether the notices were allowed to be obscured by other notices.

The plain language of RCW 10.73.120 requires the Department to "attempt to advise . . . *[e]very* person [within the designated class]". (Italics mine.) This language is unambiguous and "all inclusive". *Vega,* 118 Wn.2d at 450-51. The Legislature's use of the term "every person" requires the Department to make a meaningful attempt to advise *each individual* within the designated class of the relevant time limits, and this requires providing individual notice to each class member. The Department's act of merely posting notices on bulletin boards is insufficient to meet this requirement.

Both petitioners Runyan and Kelly were entirely within the Department's power and control during the relevant time period, making such individual notice practical and unburdensome. Petitioner Kelly regularly reported to his community corrections officer during the relevant time period. Petitioner Runyan was in the Washington Corrections Center for Women in Purdy during the entire period in question. The

Department knew it had a statutory duty to attempt to inform the petitioners of the relevant time limits. It knew precisely where they were located. No barriers existed to hinder the Department from individually providing notice to them. The Department could have easily provided actual, individual notice instead of merely constructive notice.

The majority concludes the notification statute only requires the Department to make a good faith effort to notify the statutory class members, and that constructive rather than actual, individual notice is sufficient in these cases. However, in my view, any good faith effort to inform a class member who was *entirely* within the Department's power and control during the *entire* time period at issue should logically have resulted in the individual receiving actual notice of the time limits. No barriers existed to providing individual notice in these cases.

In fact, the record indicates that many members of the statutory class received individual notice from the Department. For example, each inmate at the Washington Corrections Center at Shelton and at the McNeil Island Corrections Center, which both house male inmates, received individual copies of the notice. See Affidavit of Kurt S. Peterson, Superintendent, Washington Corrections Center, at 2-3; Affidavit of William L. Callahan, Superintendent, McNeil Island Corrections Center, at 1-2. Each inmate at the Twin Rivers Corrections Center, including petitioner Graham, also received individual notice from the Department. See Affidavit of Janet Barbour. However, crucial information regarding the time limits was not contained in Graham's notice. No rational reason can justify why the women inmates at Purdy, such as Runyan, were not entitled to the same individual notice that was available and readily provided to the male inmates at such places as Shelton and McNeil Island. The Department's failure to provide individual notice to Runyan and Kelly, while providing such notice to many others, was entirely arbitrary and unfair.

In imposing the time limitations at issue in these cases, the Legislature limited an individual's ability to challenge the legality of his or her criminal conviction and sentence. These limitations have an impact on the liberty interest of those who were sentenced under the prior version of the statute, which imposed no time limitation. The Department failed to provide meaningful notice of these changes to the petitioners, contrary to the notice requirement contained in RCW 10.73.120. The petitioners' challenges should therefore not be barred by RCW 10.73.090, and their petitions should be decided on their merits. I therefore dissent.

UTTER and SMITH, JJ., concur with JOHNSON, J.

Reconsideration denied August 3, 1993.